UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 21-10354-JEK |
| | ) | |
| 2. ANTHONY CENTEIO, | ) | |
| a/k/a "Wheezy," | ) | |
| 15. VICTOR NUNEZ, | ) | |
| a/k/a "Tito," and | ) | |
| 21. TAKARI ELLIOTT, | ) | |
| a/k/a "T-Paper," | ) | |
| Defendants | ) | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

The above-captioned third superseding indictment charged twenty-two individuals with offenses connected to Cameron Street, a Boston-based gang responsible for committing dozens of murders, attempted murders, and other violent crimes. Only three defendants remain to be sentenced: TAKARI ELLIOTT, or "T-Paper," who participated in the murder of a Brockton drug dealer; ANTHONY CENTEIO, or "Wheezy," the gang's leader, who participated in an attempted murder of a rival, sold and possessed firearms, and sold large quantities of cocaine, crack cocaine, and methamphetamine; and VICTOR NUNEZ, a drug trafficker and Cameron Street associate with a lengthy criminal history. For the reasons set out below, the government recommends that the Court sentence ELLIOTT to 276 months (or 23 years) in prison, CENTEIO to 216 months (or 18 years) in prison, and NUNEZ to 72 months (or 6 years) in prison.

### Background on Cameron Street

For decades, Boston and surrounding communities have been wracked by murders and other acts of violence committed by and against youths whose families were from or had historical ties to Cape Verde, an island nation off the coast of Senegal. Over time, different designations have been used to identify different factions, but the adversaries have always maintained a roughly

consistent geographic area of concentration. One faction is primarily based in Dorchester, in the vicinity of Bowdoin Street, Geneva Avenue, Cameron Street, and Hancock Street. The other faction is based near Uphams Corner on the Dorchester – Roxbury neighborhood line, primarily centered in and around Wendover Street, separated from their Dorchester rivals by Columbia Road, a major Boston thoroughfare.

As the violence continued, each group expanded their influence by establishing alliances with other, similar neighborhood-based gangs comprised of individuals with ties to Cape Verde. By 2010, the Dorchester-based faction included individuals from Cameron Street and began to represent themselves as Cameron Street. In 2014, younger members with ties to Norton, Onley, and Barry Streets filled the void created by the arrest of a Wendover leader and began to refer to themselves as "NOB." From the mid-1990s to now, these groups have continued to engage in what the First Circuit described as a "cacophony of ongoing mayhem." United States v. Nascimento, 491 F.3d 25, 30-31 (1st Cir. 2007). In addition to murders, Cameron Street members distributed controlled substances and firearms and committed robberies, all to preserve and expand the gang's territory and promote a climate of fear in the community.

Procedural History of the Cameron Street Case

The Cameron Street investigation proceeded in phases. For two years, agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Drug Enforcement Administration ("DEA") used two cooperating witnesses ("CW-1," an older member of Cameron Street, and "CW-2," a longtime informant) to make videotaped controlled purchases of controlled substances and firearms from members of Cameron Street. On April 14, 2022, a United States grand jury returned a superseding indictment charging nineteen members of Cameron Street with

racketeering conspiracy and numerous substantive firearm and drug trafficking offenses.[1] Agents executed arrest warrants and ten search warrants the next day. Among those charged and arrested were CENTEIO and NUNEZ.

On December 8, 2022, the grand jury returned a second superseding indictment, which added a twentieth defendant, Daronde Bethea, to the racketeering conspiracy count and enhanced drug weight allegations against several defendants (including CENTEIO) based on seizures made during the April 15, 2022, searches. On May 18, 2023, the grand jury returned the third superseding indictment (ECF No. 403), which brought the total number of defendants to twenty-two. Based on information provided by a member of Cameron Street ("CW-3"), corroborated by agents, the indictment added ELLIOTT to the racketeering conspiracy count and alleged that several defendants (including CENTEIO and ELLIOTT) were responsible for murders or attempted murders committed on behalf of Cameron Street. Relevant here, the indictment alleged that Bethea and CENTEIO were responsible for the June 11, 2018, attempted murder of a Cameron Street rival in Dorchester, and ELLIOTT and Marvin Viega, a now-deceased member of Cameron Street, committed the October 13, 2020, murder of Manual Duarte in Brockton.

On January 9, 2026, CENTEIO pleaded guilty to conspiracy to participate in the Cameron Street racketeering enterprise, being a felon in possession of a firearm, and conspiracy to distribute 500 grams or more of cocaine and 50 grams or more of methamphetamine, in violation of 18 U.S.C. §§ 922(g)(1) and 1962(d) and 21 U.S.C. § 846 (Counts 2, 7, and 11). Pursuant to a plea agreement tendered under Rule 11(c)(1)(C) (ECF No. 1294), the government agreed to recommend a sentence of no greater than 216 months in prison for CENTEIO. On January 21, 2026, NUNEZ pleaded guilty without a plea agreement to conspiracy to distribute cocaine base,

[1] One Cameron Street member, Kenny Romero, had been indicted in 2021 on drug charges. The remaining Cameron Street members were added to Romero's indictment.

in violation of 21 U.S.C. § 846 (Count 12). On February 19, 2026, ELLIOTT pleaded guilty to conspiracy to participate in the Cameron Street racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count 2). Pursuant to a plea agreement tendered under Rule 11(c)(1)(C) (ECF No. 1352), ELLIOTT admitted to knowingly participating in the Duarte murder and the government agreed to recommend a sentence of no greater than 276 months in prison.

<u>CENTEIO and ELLIOTT's Commitment To Cameron Street</u>

While CENTEIO and ELLIOTT have now admitted they were members of Cameron Street, the depth and breadth of their involvement with this violent enterprise deserves to be set out in full.

- On December 4, 2006, at 8:30 p.m., Boston Police officers responded to a shots fired call on Cameron and Hancock Streets involving a Chrysler car. Officers saw a car matching that description turn onto Cameron Street and then make an illegal U-turn back toward Hancock Street. When they pulled the car over, then encountered four individuals, including CENTEIO in the rear passenger seat and Cameron Street member Danilo Depina (discussed below) in the front passenger seat. Officers observed Depina take batting gloves he was wearing off of his hands and attempt to hide them. Officers found a spent shell casing on the floor where Depina was seated and a second casing on the outside of the vehicle beneath the windshield wiper on the passenger side. During a search of the car, officers discovered a hidden compartment in the center console which contained three loaded handguns. CENTEIO was convicted of assault with a dangerous weapon, discharging a firearm within 500 feet of a building, and unlawful possession of a firearm and sentenced to 18 months in prison. CENTEIO Pre-Sentence Report ("PSR"), ¶ 64; Exhibit 1 (Boston Police incident report).

- On May 26, 2009, at 6:40 p.m., Boston Police officers observed two men chasing two victims down Bowdoin Avenue, located a short distance away from Cameron and Hancock Streets. One man fired several shots at an intended victim as he ran and after he fell to the ground. As officers attempted to stop them, the two shooters jumped into the passenger side of a nearby van, driven by CENTEIO. Officers tried to stop the van at Washington Street, at which time CENTEIO drove the van onto the sidewalk, just missing an officer, and continued down the wrong side of the street, "showing total disregard for the safety of any oncoming traffic or pedestrians." Officers eventually arrested four men, including CENTEIO, after they abandoned the van and tried to flee on foot. Officers also recovered a .45 caliber handgun that had been thrown from the car during the chase. CENTEIO pleaded guilty to assault with a dangerous weapon (by driving the van at the officers),

accessory after the fact to assault and battery by means of a dangerous weapon (the shooting), and unlawful possession of a firearm. He was sentenced to 3 years in state prison. CENTEIO PSR, ¶ 66; Exhibit 2 (Boston Police incident report).

- While serving his sentence, CENTEO assaulted a prison guard and was convicted of assault and battery on a correctional employee. CENTEIO PSR, ¶ 67. CENTEIO prominently featured the CCTV footage of his assault in a rap video he performed (ECF No. 135 at pp. 6-7).



[CCTV footage of CENTEIO assaulting prison guard]

- On January 9, 2011, Boston Police received information that the occupants of a Chrysler PT Cruiser were Cameron Street members who were attempting to acquire ski masks. Fearing that the occupants intended to engage in violence, officers tried to stop the van, which took off at a high rate of speed before crashing near Adams and East Street in Dorchester, a short distance away from Cameron Street. ELLIOTT, Marvin Viega, a/k/a "MV," and Daronde Bethea were in the car. When officers attempted to stop Viega, he pointed an assault rifle at them, forcing the officers to discharge their service weapons. Viega was struck in the shoulder, taken into custody, treated at a nearby hospital, and then booked. From the back seat of the car, where ELLIOTT and Bethea had been seated, officers recovered a loaded .40 caliber firearm with a defaced serial number and masks. ELLIOTT and Bethea were each convicted of unlawful possession of the firearm with a defaced serial number and sentenced to 3 years in prison. Viega was convicted of assaulting the officers by means of a dangerous weapon as well as numerous firearm offenses and was sentenced to 10 years in prison. ELLIOTT PSR, ¶¶ 30-31.




[Firearm with defaced serial number and masks recovered from ELLIOTT and Bethea, Jan. 9, 2011]

- Many Cameron Street members performed or were featured in rap songs promoting the gang. CENTEIO's video "Y'All Don't Hear Me" discussed Cameron Street members who had been murdered, discussed the importance of carrying and using firearms, bragged about money made from drug trafficking and how to evade capture by "the feds," and celebrated violence committed by Cameron Street. CENTEIO wore a Montreal Canadien's jersey, which features a "C" (for Cameron Street) and "H" for Hancock Street. Portions of the video were shot in a graveyard near the headstone of a deceased Cameron Street member and featured ELLIOTT, wearing a t-shirt adorned with a "C," and Cameron Street member Danilo Depina (in the white t-shirt). The video also featured CENTEIO assaulting the prison guard, discussed above.



[Images from CENTEIO's Cameron Street rap video; ELLIOTT, CENTEIO, and Depina at right]

- In his video, CENTEIO also celebrated incarcerated Cameron Street members who had engaged in violent acts. Among those pictured was Viega, serving his sentence for the 2011 assault and firearm conviction with ELLIOTT.

- Some members of the gang marked their bodies with distinguishing tattoos or wore jewelry that feature the letter "C." CENTEIO posted this image of himself on his Snapchat account wearing a large gold "3113" necklace ("C, A, M" are the third, first, and thirteenth letters of the alphabet). Agents seized this item on April 15, 2022, when searching CENTEIO's home (ECF No. 135 (detention affidavit) at p.5):




[CENTEIO's "3113" Necklace]

- On August 20, 2016, Cameron Street members Aaron Almeida and Danilo Depina murdered an NOB/Wendover gang member in Boston. After the murder, footage from a neighborhood surveillance camera captured Depina returning to Hancock Street and being greeted and congratulated by ELLIOTT, Bethea, and other Cameron Street members. Almeida was convicted of first-degree murder and sentenced to life in prison. Depina pleaded guilty to manslaughter and was sentenced to 13 years in prison (ECF No. 1332 (trial brief) at pp. 9-10).

- On June 11, 2018, CENTEIO, Bethea, and CW-3 committed an attempted murder of an NOB/Wendover gang rival in Dorchester. CW-3 testified he was with CENTEIO when CENTEIO received a telephone call. CENTEIO told CW-3 to take a ride with him. When they parked, CENTEIO told CW-3 that "he was about to witness a murder." A short time later, CW-3 saw an NOB/Wendover gang member (identified as Victim No. 11 in the indictment) walk towards a car. CW-3 then saw Bethea come out between two houses and start shooting. When CW-3 asked CENTEIO who Bethea shot, CENTEIO told CW-3 the correct first name of Victim No. 11. Based on the information provided by CW-3, including the first name of Victim No. 11, agents located a Boston Police report from June 11, 2018, describing a shots-fired call at 679 Columbia Road in Dorchester where Victim No. 11 was brought to Boston Medical Center for treatment for gunshot wounds including a collapsed lung. CW-3 testified that several days later, with other Cameron Street members on Howe Street, CENTEIO told CW-3, "Freeze (Bethea) really don't miss" and "he didn't miss a shot" when targeting the victim. CENTEIO PSR, ¶ 16:



[June 11, 2018, shooting at 679 Columbia Road by Bethea and CENTEIO]

- On October 13, 2020, ELLIOTT and Viega murdered Manual Duarte, a/k/a "Brava," in the driveway of 94 Belmont Avenue in Brockton. Based on witness interviews, an examination of surveillance videos, and a review of communications between Duarte and ELLIOTT, state homicide detectives determined that on the day of the murder, Viega (through his girlfriend) rented a car in Boston and drove to Brockton, where he picked ELLIOTT up at ELLIOTT's girlfriend's home. Throughout the day of the murder, ELLIOTT – using the Snapchat display name "CamIAm" and the username "PapiPapes," a variant of his nickname "T-Paper" – communicated with Duarte over Snapchat trying to get Duarte to meet him at 94 Belmont Avenue to conduct a drug deal. ELLIOTT dropped off Viega near 94 Belmont Avenue, then drove Viega's rental car to the driveway of 94 Belmont Avenue where he met with Duarte. After a few minutes, ELLIOTT drove away. Viega emerged from the backyard and shot Duarte ten times, killing him.



[Duarte murdered in red Dodge parked in driveway of 94 Belmont Avenue, Brockton, Oct. 13, 2020]

- CW-3 testified before a United States grand jury that shortly after the Duarte murder, CW-3 was with Viega at CW-3's house. According to CW-3, Viega had recently been released from a lengthy prison sentence (the 2011 assault and firearm conviction committed with ELLIOTT and Bethea discussed above) and Viega had sought out younger Cameron Street members who had joined the gang while he was incarcerated. Viega told CW-3, "I just got paid," and told him that several older gang members in Brockton had gotten together and pooled money for a contract to murder Duarte because Duarte was robbing too many drug dealers. Viega told CW-3, "You see what happened to Brava (Duarte)? That was me. I never liked him anyways. You just know I had to take that." Viega also told CW-3, "I gave $30,000 to 'Papes' because he was the driver." CW-3 identified "Papes" as ELLIOTT. From CW-3's phone, agents recovered images of Viega holding a large wad of cash. Viega told CW-3 that the cash was from the proceeds of the murder contract. According to CW-3, some of these composite images or social media posts were made by other Cameron Street members after Viega was killed. According to CW-3, this murder-for-hire was similar to other violent crimes the gang committed for financial profit, including home invasion robberies.




[Social Media Posts and Composite Image of Marvin Viega, a/k/a "MV"]

- ELLIOTT and Viega were initially charged with murder in state court. ELLIOTT was arrested and held in state custody. Viega fled to Nashville, Tennessee. When Nashville police officers conducted a traffic stop of a car carrying Viega, Viega confronted the officers with a knife and officers were forced to kill Viega. ELLIOTT PSR, ¶¶ 32-36.

In addition to their personal participation in Cameron Street violence, CENTEIO and ELLIOTT, like many members of Cameron Street, supported themselves and the enterprise through drug trafficking. So, too, did NUNEZ, who was affiliated with members of Cameron Street

but not considered a member.

ELLIOTT was serving a federal sentence or held on bail on state drug charges during much of the Cameron Street investigation:

- In 2017, ELLIOTT was convicted in U.S. District Court in Boston with distribution of cocaine base. United States v. Takari Elliott, Cr. No. 17-10023-IT (now JEK). He was sentenced to 30 months and prison and three years of supervised release. ELLIOTT's first federal case involved hand-to-hand sales of cocaine to a cooperating witness in and around Howe Street, in the Cameron Street neighborhood. When ELLIOTT was arrested, agents seized 200 grams of cocaine, plastic baggies, digital scales, and cutting agents from his residence. ELLIOTT PSR, ¶¶ 37-38.

- On January 11, 2020, ELLIOTT possessed with intent to distribute a baseball-sized quantity (later determined to be 61.9 grams) of cocaine in Brockton. In addition to the drugs, troopers with the Massachusetts State Police seized a plastic baggie commonly used to package drugs, cheap "burner" phones commonly used by drug dealers, and $3,718 from ELLIOTT's person. ELLIOTT PSR, ¶¶ 39-43.

- On February 25, 2021, agents directed a cooperating witness (CW-2) to contact Cameron Street member and co-defendant Charod Taylor to purchase crack cocaine. Cameron Street ran an open-air drug market at the parking lot for Fernandez Liquors, located on Hancock Street. When CW-2 arrived in the parking lot, agents observed Taylor walk to a car rented to CENTEIO, then walk back to CW-2 and hand CW-2 bags of powder and crack cocaine in exchange for cash. Taylor told CW-2 he was leaving town for a while. By video chat, Taylor introduced CW-2 to "Tito," identified as co-defendant VICTOR NUNEZ, and NUNEZ told CW-2 that he would be available to supply CW-2 with cocaine. When CW-2 asked, "You guys all work together?" Taylor replied, "We all peoples. We family, this is our neighborhood, we all from the same neighborhood." While they were speaking, ELLIOTT (after the Duarte murder but before his state arrest), identified himself as "Paper" as he walked up to CW-2's car to join the conversation with Taylor and Nunez. After CW-2 met ELLIOTT, Taylor again assured CW-2, "we all on the same page." ELLIOTT PSR, ¶ 44.

CENTEIO, on the other hand, regularly sold crack and powder cocaine during the investigation to CW-1. Many of those controlled purchases were from CENTEIO directly; others involved CENTEIO and his cousin and co-defendant, Michael Lopes (not a member of Cameron Street). In addition to narcotics, CENTEIO also sold CW-1 a firearm:

| Date | Location | Seller | Exhibit |
|---|---|---|---|
| 9/1/20 | CW-1's vehicle, parked at Home Depot parking lot, South Bay Shopping Center, 8 Allstate Road, Boston, Massachusetts | ANTHONY CENTEIO | Heckler and Koch Model 9 millimeter semiautomatic pistol bearing serial number 224-156477, loaded with ten rounds of 9 millimeter ammunition in exchange for $700 in government funds |
| 2/9/21 | CW-1's vehicle, parked at Gaslight Villages apartment complex, 1021 Main Street, South Weymouth, MA | ANTHONY CENTEIO | Approx. 25 grams or one ounce of cocaine in exchange for $1700 in government funds |
| 3/4/21 | CW-1's vehicle, parked on Fifield Street, Boston, Massachusetts | ANTHONY CENTEIO | Approx. 28 grams or one ounce of cocaine in exchange for $1700 in government funds |
| 5/18/21 | CW-1's vehicle, parked on Fifield Street, Boston, Massachusetts | ANTHONY CENTEIO | Approx. 82 grams or three ounces of cocaine in exchange for $4,500 in government funds |
| 7/14/21 | CW-1's vehicle, parked near TGI Friday's, Braintree Mall, Braintree, Massachusetts | ANTHONY CENTEIO, MICHAEL LOPES | Approx. 56 grams of cocaine and 28 grams of cocaine base in exchange for $4,200 in government funds |
| 9/16/21 | 38 Arch Street, Pawtucket, Rhode Island (Lopes's residence) | ANTHONY CENTEIO, MICHAEL LOPES | Approx. 56 grams or two ounces of cocaine base and 28 grams or one ounce of cocaine in exchange for $4,200 in government funds |
| 12/2/21 | CW-1's vehicle, parked near 120 Train Street, Boston, Massachusetts | ANTHONY CENTEIO, MICHAEL LOPES | Approx. 84 grams or three ounces of cocaine base in exchange for $4,200 in government funds |
| 1/12/22 | CW-1's vehicle, parked on Fifield Street, Boston, Massachusetts | ANTHONY CENTEIO | Approx. 84 grams or three ounces of cocaine in exchange for $4,200 |

| Date | Location | Seller | Exhibit |
|---|---|---|---|
| 3/31/22 | CW-1's vehicle, parked on Arch Street, Pawtucket, Rhode Island | ANTHONY CENTEIO | Approx. 82 grams or three ounces of cocaine in exchange for $2,800 |

On April 15, 2022, agents executed search warrants at CENTEIO's home in Rehoboth and seized $25,760 in U.S. currency, a Glock .45 caliber semi-automatic pistol, 21 rounds of .45 caliber ammunition, and numerous artifacts of clothing featuring the letter "C," including caps and sweatshirts for the Kansas City Chiefs football team, a cap for the Oklahoma City Thunder basketball team, and the Montreal Canadiens jersey CENTEIO wore in his rap video.



[Glock .45 caliber handgun, Montreal Canadiens jersey, and $25,600 in cash seized from CENTEIO's residence]

Agents also executed a search warrant at Lopes's residence at 38 Arch Street in Pawtucket. CENTEIO and LOPES were present in the Arch Street apartment. From the residence, agents seized approximately 170 grams of cocaine base, 215 grams of cocaine, and 175 grams of methamphetamine, as well as packaging materials and $2,342 in cash.



[170 grams of cocaine base, 215 grams of cocaine, and 175 grams of methamphetamine seized from CENTEIO and his cousin]

All told, CENTEIO distributed or possessed with intent to distribute 342 grams of cocaine base, 434 grams of powder cocaine, and 175 grams of methamphetamine. CENTEIO PSR, ¶¶ 17-25.

NUNEZ has been observed with Cameron Street members over the years, but NUNEZ's involvement in the Cameron Street investigation was limited to two days. At the conclusion of the February 25, 2021, purchase described above, Taylor told CW-2 that he was leaving town for a while and introduced CW-2 to NUNEZ over a FaceTime video call. NUNEZ told CW-2 that he would be able to supply CW-2 with cocaine in the future. On February 26, 2021, CW-2 placed a recorded call to Taylor and ordered two "8-balls" of crack and two "8-balls" of powder cocaine from him. Taylor agreed to sell to CW-2 and provided CW-2 with the phone number for "Tito" (NUNEZ) who would bring the drugs to her. CW-2 then spoke to NUNEZ, who in turn delivered approximately 6.8 grams of cocaine base and 7.3 grams of cocaine to CW-2 in a McDonalds parking lot at 128 Broadway Street in Everett. NUNEZ PSR, ¶¶ 18-19.

The Guideline Sentencing Ranges

In the final versions of the defendants' PSRs, dated June 30, 2026 (CENTEIO and NUNEZ) and September 22, 2026 (ELLIOTT), the United States Probation Office calculated the following total offense levels ("TOL"), criminal history categories ("CHC"), and advisory

guideline sentencing ranges ("GSR"), with appropriate reductions for acceptance of responsibility:

- ELLIOTT PSR:
  - TOL 40, see ¶¶ 53, 56, 62 (murder)
  - CHC III, see ¶¶ 68-69 (2011 firearm conviction, 2017 federal drug conviction)
  - GSR 360 months-life, see ¶ 129
- CENTEIO PSR:
  - TOL 35, see ¶¶ 36-61 (grouping of attempted murder and drug trafficking)
  - CHC VI, see ¶¶ 64, 66, 70 (career offender pursuant to USSG § 4B1.1 based on two assault with a dangerous weapon convictions)
  - GSR 292-365 months, see ¶ 104
- NUNEZ PSR:
  - TOL 29, see ¶¶ 30, 33, 47-48 (small drug quantity but career offender offense level set by USSG § 4B1.1, based on convictions for distribution or possession with intent to distribute cocaine)
  - CHC VI, see ¶¶ 47-48, 53-54, 56, 58-63 (21 criminal history points from convictions for drug offenses, assault with a dangerous weapon, domestic assault and battery, restraining order violations, and career offender)
  - GSR 151-188 months, see ¶ 142.

## Argument

ELLIOTT. Even in the context of an indictment replete with spectacular acts of violence, ELLIOTT and Viega's October 13, 2020, murder of Manual Duarte stands out. The majority of the violence committed by Cameron Street members (including CENTEIO's attempted murder, discussed below) targeted members of NOB/Wendover, as the two gangs attacked each other with

metronomic regularity. However, in addition to drug and firearm sales like those detailed above, members of Cameron Street committed violent crimes, like brazen home invasion robberies, that secured a financial windfall and also served to enhance the gang's power, influence, and status. When Viega was hired to murder Duarte, ELLIOTT did not hesitate to join in.

In the run-up to the murder, ELLIOTT communicated with Duarte via Snapchat, arranging a "drug purchase" whose true purpose was to set a meeting time and location for the murder. Viega picked up ELLIOTT in a rental car; before the two men arrived at 94 Belmont Avenue, Viega got out of the car; ELLIOTT met with Duarte in the driveway; and a few seconds after ELLIOTT drove away, Viega emerged and murdered Duarte. This was not a chance encounter where a rival suddenly rounded the corner and came upon ELLIOTT and Viega. This was an assassination, for pay. Viega then bragged about the murder as a way of reintroducing himself to younger members of Cameron Street, like CW-3, who had joined Cameron Street while Viega was in prison.

After state murder charges issued, Viega fled. Months later, when he was encountered in Nashville, Tennessee during a traffic stop, Viega brandished a knife at the officer, tried to get away in his police car, and then chased after the officer with a knife, forcing the officer to discharge his service weapon and kill him.

With that history, it seems clear that Viega was the driving force behind the Duarte murder. However, out of all of the members of Cameron Street, ELLIOTT was especially well-positioned to know what Viega was capable of. In 2011, ELLIOTT, Viega, and Bethea were intercepted on their way to commit a murder, armed with multiple firearms and masks. When Viega was cornered by officers, he tried to shoot them with an assault rifle before being shot himself. In his sentencing memorandum, ELLIOTT argues that his participation in the murder was "aberrational" (see ECF No. 1433 at 16), but the fact that law enforcement successfully thwarted Viega and ELLIOTT plan

to commit a murder does not change the essential character of that arrest. And as noted above, during the decade that Viega was in prison, ELLIOTT was captured celebrating other Cameron Street violence, either in CENTEIO's rap video or on neighborhood surveillance cameras. Against this backdrop, ELLIOTT's willingness to participate in the Duarte murder – including his use of social media to lure Duarte and depositing Viega near the murder scene – appears entirely consistent with the "organized mayhem" regularly committed by members of Cameron Street. And ELLIOTT did it all while on supervised release from a federal cocaine distribution conviction.

The government's sentencing recommendation for ELLIOTT is consistent with other non-cooperator RICO murder sentences imposed in this district with acceptance of responsibility.[2] It considers his role in the offense, his age, and his criminal history.[3] If the Court adopted the government's recommendation, it would be the highest sentence imposed in this case. That is as it should be. The defendant compares his conduct to other Cameron Street defendants who received lower sentences for violent racketeering acts (ECF No. 1433 at pp. 16-20, discussed more fully in the CENTEIO section below), but the simple truth is that, while the Cameron Street members who

---

[2] In this district, most of the data points for RICO murder non-cooperator sentences with acceptance are drawn from cases involving prosecutions of MS-13. In US v. Recinos-Garcia et al., No. 15-10338-FDS, sentences ranged 22 years to around 35 years in prison (see Bryan Galicia-Barillas, 264 months; Hector Ramirez, 324 months; Rigoberto Mejia, 330 months; Jairo Perez, 420 months; Edwin Diaz, 420 months; Carlos Melara, 432 months; Joel Martinez, 480 months). In US v. Flores et al., No. 18-10450-MLW, the sentences were higher, ranging from 33 years to life (see Jonathan Tecero Yanes, 396 months; Erick Lopez Flores, 480 months; Eliseo Vaquerano Canas, 516 months; Henri Salvador Gutierrez, life). See also US v. Pineda Portillo et al., No. 17-10125-WGY (Jose Vasquez sentenced to a combined 38-year sentence). As in all cases, the sentences imposed vary based on many factors, including the number of violent crimes each defendant committed, the roles they played in the murders, their ages, and their criminal histories. Several members of the Trinitarios gang have been charged with RICO murder, see US v. Paula-Cabral et al., Cr. No. 25-10058-NMG, but none have been sentenced yet. The important point is that no defendant has been sentenced to less than 22 years in prison for a RICO murder.

[3] ELLIOTT's argument concerning his criminal history and the applicability of USSG § 2E1.1, application note 4 (see ECF No. 1433 at pp. 8-12) is largely rendered moot given the range contemplated by the plea agreement.

pulled the triggers in those cases intended for their victims to die, they did not. ELLIOTT got Duarte to 94 Belmont Avenue and delivered Viega to the scene knowing that Viega would accomplish their jointly undertaken mission of murdering Duarte. On these facts, it is appropriate, even necessary, for ELLIOTT to serve a sentence of 276 months in prison. That sentence achieves general deterrence, in that it effectively communicates the real-world consequences of joining violent criminal conspiracies like Cameron Street. It will serve to specifically deter ELLIOTT, something that many other judges have failed to accomplish before now. It promotes respect for the law and serves to protect the public from ELLIOTT. And it is within the heartland of sentences imposed in other RICO murder cases in this district.

CENTEIO. By the time of the Cameron Street investigation, CENTEIO had been convicted of two substantial crimes of violence. CENTEIO helped Danilo Depina conduct a shooting in the Cameron Street neighborhood and was arrested in a car with several firearms secreted in a hidden compartment. CENTEIO followed that up by transporting an associate to the scene of a shooting and then driving their car directly at a police officer who tried to stop them. On both occasions, CENTEIO was convicted of assault with a dangerous weapon and unlawful possession of a firearm, among other offenses. CENTEIO PSR, ¶¶ 64, 66, and Exhibits 1-2.

One of CENTEIO's offenses of conviction was Count Eleven, conspiracy to distribute 500 grams or more of cocaine and 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846, an offense that carries a maximum potential penalty of 40 years in prison. 21 U.S.C. § 841(b)(1)(B)(ii) and (viii). Under the Sentencing Guidelines, a "career offender" is a defendant who committed a controlled substance offense like Count Eleven and who had at least two prior convictions for a "crime of violence" or a "controlled substance offense." USSG § 4B1.1. The First Circuit has ruled that assault with a dangerous weapon is a crime of violence. See United

States v. Williams, 80 F.4th 85, 93-94 (1st Cir. 2023); United States v. Fields, 823 F.3d 20, 35 (1st Cir. 2016) (same); United States v. Hudson, 823 F.3d 11, 18 (1st Cir. 2016) (ADW crime of violence under the similar Armed Career Criminal Act).

Defendants who meet these criteria are subject to enhanced offense levels, criminal history categories, and GSRs. Under USSG § 4B1.1(b), the controlled substance offense statutory maximum sets the offense level. Thus, CENTEIO's 40-year statutory maximum establishes a career offender base offense level of 34. USSG § 4B1.1(b)(2). In every case, a career offender's criminal history category is VI. USSG § 4B1.1(b).

In the PSR, Probation correctly determined that CENTEIO was a career offender. CENTEIO PSR, ¶¶ 58, 64, 66. Before assessing the impact of CENTEIO's attempted murder on the guidelines and the government's recommended sentence, it is important to recognize that, just based on the evidence in Count Eleven alone – overwhelming evidence, where CENTEIO was recorded delivering or agreeing to deliver crack and powder cocaine to CW-1 eight times and was arrested in possession of large quantities of crack and powder cocaine and methamphetamine – CENTEIO would, with acceptance, face a GSR of 188-235 months in prison.



[CENTEIO delivering cocaine to CW-1, March 4, 2021]

Viewed in this light, CENTEIO's Rule 11 protestations denying any involvement in the June 11, 2018, shooting of Victim No. 11 take on a different character. The government's 216-month plea agreement recommendation is within the range contemplated by the drug count alone. Based on the information provided by CW-3 and corroborated by agents, the government's recommended sentence for CENTEIO is, like ELLIOTT's, appropriate and necessary.

In his grand jury testimony, CW-3 identified CENTEIO as "basically the leader of Cameron. He like – he makes what we call a lot of shots. He's like the top guy . . . whatever is about to go down, he is the one that like makes it happen, basically." That accurately describes CENTEIO's role in the attempted murder of Victim No. 11, a gang rival. CENTEIO had obviously communicated in some fashion with Daronde Bethea before the shooting, since CENTEIO had time to ask CW-3 to accompany him to 679 Columbia Road and knew that Bethea was set up there to commit a "murder." CW-3 also knew the first name of Victim No. 11, and with that, agents were able to locate the Boston Police incident report of the shooting.

Why should the Court credit CW-3's information about CENTEIO's role in this shooting? As was set out in detail in the government's trial brief for ELLIOTT (ECF No. 1330), when the third superseding indictment was returned, agents learned from a different informant unaffiliated with Cameron Street, CW-5, that Bethea admitted he had committed the June 11, 2018, shooting ("That one's mine"). Bethea then told CW-5 that he knew CW-3 was cooperating because there were only three Cameron Street members present for the shooting and two of them (CENTEIO and Bethea) had been charged. Bethea identified CW-3 by a Cameron Street gang name. The name Bethea gave to CW-5 and that CW-5 provided to agents was the creole version of CW-3's Cameron Street gang name. CW-5 did not know the true name or identity of CW-3. CW-5 said that Bethea regularly discussed the need to murder CW-3 and CW-5 recorded a conversation where Bethea

endorsed killing CW-3 ("All of us in a tight spot" and "We all got one problem. Handle that."). Bethea eventually pleaded guilty to racketeering conspiracy and other offenses pursuant to a plea agreement where he admitted his participation in this previously unsolved attempted murder as well as two violent home invasion robberies (ECF No. 647) and was sentenced to 250 months in prison (ECF No. 786).

CW-3 also told agents about a March 21, 2019, shooting at 39 Claybourne Street in Dorchester of a different NOB member. According to CW-3, Cameron Street member Eric Correia repeatedly called him to get him to shoot Victim No. 14, who Correia had seen on Claybourne Street. Correia told CW-3 he could not do the shooting himself because he was wearing a GPS device. By the time CW-3 returned the call, Correia told him that he had gotten another Cameron Street defendant, Clayton Rodriguez, to shoot Victim No. 14, and footage from a neighbor's surveillance camera captured a grainy image of someone with Rodriguez's build approaching Victim No. 14 and firing.[4] When agents obtained GPS data for Correia from the day of the shooting, they verified that Correia had circled Claybourne Street for fifteen minutes shortly before Victim No. 14 was shot. Correia pleaded guilty to racketeering conspiracy and other offenses pursuant to a plea agreement where he admitted his participation in this previously unsolved attempted murder (ECF Nos. 725-726) and was sentenced to 180 months in prison (ECF No. 970).

CW-3's information about ELLIOTT was corroborated by the homicide investigation generally as well as social media posts showing Viega holding a large amount of cash. CW-3's information about Correia was corroborated by GPS data placing Correia at the scene of the attempted murder shortly before it occurred. CW-3's information about Bethea's attempted murder was corroborated by an informant wholly unrelated to Cameron Street who recorded Bethea

[4] Rodrigues is currently a fugitive.

expressing his desire that CW-3 be murdered to prevent CW-3 from testifying against him and the other members of Cameron Street. Against this backdrop, it is hard to fathom why CW-3 would incorrectly or maliciously lump CENTEIO in to the June 11, 2018, attempted murder with Bethea, particularly in the role of lookout.

Instead, the evidence supports the conclusion that CENTEIO brought CW-3 to the scene of the murder to ensure that Bethea had Cameron Street support as Bethea sought to murder an NOB member. And as the crime scene photo depicted above makes clear, only random chance and the close proximity of the victim to excellent medical care spared Bethea and CENTEIO from a murder charge. CW-3's information; CENTEIO's large-scale drug trafficking; CENTEIO's firearm possession and sale; and CENTEIO's exhortations to other Cameron Street members to continue to engage in murder and other violent crimes, all support the government's recommended sentence of 216 months in prison.

<u>NUNEZ</u>. As noted above, NUNEZ's involvement in the Cameron Street investigation was limited to a single drug sale to CW-2, and the investigation revealed that NUNEZ was associated with, but not a member of, the gang. Still, NUNEZ's criminal history is abhorrent. NUNEZ is in CHC VI, the highest criminal history category, by virtue of his compilation of 21 criminal history points achieved through a bewildering series of convictions, including drug distribution, assault with a dangerous weapon, domestic assault and battery, restraining order violations, and habitual driving offenses. NUNEZ PSR, ¶¶ 47-48, 53-54, 56, 58-63.

Probation also concluded that NUNEZ was a career offender pursuant to USSG § 4B1.1, because he committed a drug offense and had two prior state convictions for cocaine distribution. NUNEZ PSR, ¶ 30. In light of the First Circuit's recent decision in <u>United States v. Fulcar</u>, 181 F.4th 63 (1st Cir. 2026), it appears unlikely that NUNEZ's state cocaine convictions will continue

to serve as career offender predicates. In Fulcar, the First Circuit ruled that the term "controlled substance" is defined exclusively in reference to federal law at the time of the defendant's sentencing. Because the Massachusetts "Class B" drug schedule includes not only cocaine but ioflupane, which beginning in 2015 the federal schedule excepted, state convictions for distributing a "Class B substance" no longer qualified as a career offender predicate. See Fulcar, 181 F.4th at 83 ("In sum, we agree with Fulcar that what matters is whether ioflupane was 'controlled' by the federal government at the time of his federal sentencing. And, because it was not, we also agree with Fulcar that the District Court erred in applying the career offender guideline to him based on his 2008 Massachusetts law conviction for possession with intent to distribute 'cocaine'").

However, there is every reason for the Court to grant an upward variance in this case based on the recidivism concerns apparent in NUNEZ's PSR. The First Circuit's holding in Fulcar notwithstanding, NUNEZ repeatedly distributed cocaine, not a drug used to diagnose Parkinson's patients that would require ingesting 6,000 vials to become intoxicated. See Brown v. United States, 602 U.S. 101, 109-110 (2024 ("These cocaine convictions would be excluded even though it is highly unlikely that any were based on the possession or sale of the Parkinson's drug. That derivative is radioactive, so it can be produced only through a 'highly technical and complex synthetic route,' and the drug in which it appears can be stored for no more than 24 hours. Furthermore, anyone attempting to become intoxicated by using the drug would need to inject 'nearly 6,000 vials,' or '15 liters of fluid, a volume likely to cause death if administered intravenously. Unsurprisingly, the Federal Government has identified 'no case report' involving individuals who misused the drug, or any other Ioflupane-containing product") (cleaned up). For this reason, the government will likely be routinely seeking upward departures for individuals who,

like NUNEZ, are career offenders in the ordinary, everyday meaning of the phrase, even if they no longer qualify as career offenders under the Guidelines after Fulcar.

Given NUNEZ's age, his history of addiction, and his distribution of a relatively small quantity of drugs, the government would not have recommended a career offender guideline sentence in his case, even if Fulcar had come out the other way. Still, NUNEZ's criminal history is simply too long, too varied, and often too violent to be ignored. The government believes that a substantial period of incarceration is necessary to specifically deter NUNEZ and to protect the public from him. For that reason, the government recommends that the Court sentence NUNEZ to 72 months in prison.

## Conclusion

For the reasons set out above, the government recommends that the Court sentence ELLIOTT to 276 months in prison, CENTEIO to 216 months in prison, and NUNEZ to 72 months in prison. The government further recommends that each defendant be placed on supervised release for a period of three years.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ Christopher Pohl
Christopher Pohl
Brian A. Fogerty
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 15, 2026.

/s/ Christopher Pohl
Christopher Pohl
Assistant U.S. Attorney